*Cates & Lindsey* for appellant.

---

## Clay *vs* McClanahan.

ERROR TO THE MADISON CIRCUIT.

*Assignor and Assignee.*

JUDGE MARSHALL delivered the opinion of the Court.—Judge Breck did not sit.

CHANCERY.

*Case* 58.

*Oct.* 21.

THIS bill was filed by Clay to enjoin judgments obtained against him on notes executed by him to G. Weddel, and assigned to McClanahan and others. The principal question arising in the case, grows out of the fact that Clay, when informed of the assignment of the first note to McClanahan, a few weeks after it was made, promised that he would either pay or arrange the amount on seeing McClanahan, as he expected to do in a few days. But finding, a few days afterwards, that Weddel would not and could not perform the executory part of the consideration on which the note was founded, and that in consequence thereof, he would himself be subjected to heavy payments and expenditures, he refused payment on this ground, which he sets up in his bill.

*The case stated.*

It may be true that when an obligor has, by promising payment to a third person, induced him to take a note by assignment, for a valuable consideration, or when after assignment, he has by such promises obtained indulgence, which would impair the recourse of the assignee against the assignor, he may be considered as waiving a known equity against the note; and on the

*Promises of paying a note to an assignee, made after the assignment, do not bar the obligor from setting up an equity then unknown to the obligor, especially where there*

VOL. V. 31

CLAY
vs
McCLANAHAN.

has not been a
forbearance to
sue at his re-
quest, which
destroyed the re-
course vs as-
signee.

ground of a consideration for such promise, consisting either in a benefit to himself or a loss to the other party, induced by his promise, he may be precluded from relying even upon an equity then unknown. But here the assignment preceded Clay's promise, the assignee was not induced thereby to part with his money for the note, and Clay obtained no benefit in the way of forbearance.

It appears, however, that in the interval between the day on which Clay's promise was made and that on which he was to have seen McClanahan, which was not more than two weeks, and perhaps less than one, Weddel had a public sale of his land, and mills situated thereon, and part of his personal property, and that Clay being the surety of Weddel to the amount of about eight thousand dollars, upon transactions unconnected with the notes in question, attended the sale, and as the highest bidder, fairly purchased the whole of the property sold, which was not more than enough to secure a fair indemnity for his liabilities as Weddel's surety; and on the same or the following day, he took a mortgage upon a few remaining articles of Weddel's personal property, to indemnify him against certain liabilities, the assumption of which by Weddel, had constituted a part of the consideration of the notes now in question. By these arrangements he acquired all the known property of Weddel; and it is contended that by his conduct in this respect, he has either on the ground of fraud or on the ground of having, by his promise, lulled McClanahan and prevented him from obtaining indemnity from Weddel, precluded himself from setting up against McClanahan any equity growing out of the consideration of the notes.

If Clay knew, or had good reason to believe when he made the promise to McClanahan, that Weddel's property would not indemnify him as his surety and also enable Weddel to make good his assumption which formed the consideration of the notes, it might, perhaps, be said that after his unconditional promise to pay the notes, he could not fairly rely upon this insufficiency as a ground of equity against it. If Clay had no reason to suppose that there would be such deficiency, and consequently had no apprehension that the liabilities which Weddel had assumed

as the consideration of the notes, would be thrown upon him, he acted fairly in saying he would pay the notes, and was not thereby debarred from securing himself against his own distinct liabilities for Weddel; nor is it by any means certain that McClanahan's situation would have been bettered by a communication at that time of all the contingencies on which Clay's equity against the note would depend. If Clay had said this note is just and I am bound to pay it so far as I know, and therefore intend to pay and will pay it, but it was given in consideration that Weddel agreed to pay all outstanding debts against the late firm of Clay & Weddel, and also to complete the grist mill which said firm had undertaken to build, and should he fail in this, which I do not apprehend, I will have an equity against the note on which I shall rely, what could McClanahan have done? He might have asked Weddel for an indemnity, and Weddel had it in his power then to have furnished it, by a mortgage upon his mills. But it is evident that Weddel was desirous of selling his mills, and that to avoid encumbering them, he was keeping up the idea of his solvency and ability to meet all his engagements. It is not probable that upon so remote a contingency as that of his failure, McClanahan would have demanded an indemnity from him. And it is almost certain that he would not have so far admitted his embarrassments or impeded the sale of his property as to have given a mortgage upon it. Nor would McClanahan have had a right to coerce it. Weddel does not say he would have indemnified McClanahan if Clay had even said he would not pay the note. But he says he could not have indemnified McClanahan without subjecting Clay to loss as his surety, and his sale appears to have been made principally to prevent this loss. But this speculation seems to be out of place. It never has been held that the obligor is bound, upon being apprised of the assignment of the note, to communicate all the circumstances which constitute its consideration, or the contingencies on which his equity against it may depend, when those contingencies have not happened and are not expected to happen, in such a way as to affect the consideration. His equity arising out of the consideration of

the note is inherent, and remains, notwithstanding the assignment. It is prior in date and can only be lost by bad faith, or by a waiver, or by a promise founded on consideration. There is no ground to impute bad faith to Clay in making the promise, and the promise being founded on no consideration, and being made without a knowledge of the facts which constituted afterwards a failure of the consideration of the note, did not either by its own force or on the ground of a waiver, destroy his equity. And with regard to the subsequent events, as it cannot be assumed that there was any collusion between him and Weddel, but the sale, so far as appears, was a measure of Weddel's own, which, so far as regards the mills, he had for some time contemplated, Clay had a perfect right to attend it and to purchase for his own security. Nor do we presume that he stands in any worse condition with regard to McClanahan, by having become the purchaser himself, than if another had purchased and thus relieved him from his engagements for Weddel, unless it could be shown, as it has not been, that he purchased in trust for Weddel, and might be held accountable in that character, for so much of the trust fund as might remain after fully indemnifying himself. But it is not shown that he has got more than an indemnity.

The testimony of Weddel himself, negatives the idea that Clay supposed, when he made the promise to pay McClanahan, that Weddel would fail in his engagements which constituted the consideration of the notes. He thought then and afterwards, that he would be in Weddel's debt. And it may be assumed that he did not know even when he purchased Weddel's property, that the amount of Weddel's unpaid debts, for which he was surety, would absorb the whole amount of his purchase ; but that on the contrary, he then supposed they would leave enough to allow him to pay off these notes of his to Weddell, or the greater part of them, out of the purchase money, besides paying the debts for which he was surety. For even after the sale, he offered to Baxter, who had an assignment of nine hundred dollars in one of the notes, to take it up and give him a new note for it, saying he would have enough in his hands ; and although he took a

mortgage on personal property of the value of a few hundred dollars, as an indemnity against his liability for some of the firm debts, which Weddel had assumed to pay, he left the personal property which he had bought, (of no great value it is true, but which in addition to the real property, turns out not to have been more than an indemnity for his suretyships,) in the possession of Weddel, and never has had the enjoyment of it. We account for Clay's ignorance at that time, of the true extent of his pending liabilities for Weddel, by the fact already stated, that Weddel was solicitous to keep up his credit until he should sell his mills, and therefore, held out the idea that he was good for all his engagements. Upon the whole, therefore, we are of opinion that the Circuit Court did not err in allowing the equity set up by Clay, growing out of Weddel's failure to pay the firm debts and complete the mill, as he had covenanted to do, and the consequent payment of these debts and expenses by Clay; and this equity is good as far as it goes, against each of the notes in the hands of McClanahan and Baxter.

To rebut or diminish the effect of this equity, the defendants have not only questioned and resisted various credits claimed by Clay on account of his payment of firm debts, and of the costs of building the mill, but also contend that there was fraud or mistake in the settlement between Clay and Weddel, on which the indebtedness of Weddel to Clay, at the time of dissolution of their partnership was ascertained, and that said indebtedness being made to appear much greater than it really was, the notes given by Clay for the purchase of Weddel's interest, (the whole price of which was $10,000,) were to the same extent smaller than they should have been; and they claim a re-settlement of the accounts between the partners at the time of the dissolution, and all the advantage therefrom which Weddel himself would be entitled to, to the extent of the notes assigned to them.

We have bestowed much attention upon this part of the subject, and after scrutinizing the accounts and vouchers as well as the depositions relating to them, we are of opinion that although there are a few items on each side, as admitted by the Court, of doubtful propriety, and

some that were excluded which possibly might have been taken in, the record furnishes no ground for any substantial departure from the decree which would make the result materially different, or would place it on more satisfactory grounds. Without, therefore, going into any detail upon these questions, the decree on the original and cross errors is affirmed.

Goodloe for plaintiff: *Turner and Morehead & Reed*. defendant.